IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MARYLAND, NORTHERN DIVISION

|                                    |     |                            |
|------------------------------------|-----|----------------------------|
|                                    | *   |                            |
| MEDIBILL OF MARYLAND, INC., et al.,| *   |                            |
|                                    |     |                            |
| Plaintiffs,                        | *   |                            |
| v.                                 |     | CIVIL NO.: WDQ-04-CV-4015  |
|                                    | *   |                            |
| ANESTHESIA BUSINESS                |     |                            |
| CONSULTANTS, LLC, et al.,          | *   |                            |
|                                    |     |                            |
| Defendants.                        | *   |                            |

*    *    *    *    *    *    *    *    *    *    *    *    *

MEMORANDUM OPINION AND ORDER

Medibill of Maryland, Inc. ("Medibill") and Joetta Smith ("Ms. Smith") sued Anesthesia Business Consultants, LLC ("ABC") and Joseph Locke ("Locke") under various tort theories for the loss of a business relationship.  Pending are Defendants' motion to dismiss the Complaint, or in the alternative, for summary judgment, Plaintiffs' cross motion for partial summary judgment, and Defendants' objections to Magistrate Judge Susan K. Gauvey's December 23, 2005 discovery order.  For the following reasons Defendants' motion to dismiss will be granted in part and denied in part, Plaintiffs' motion for partial summary judgment will be denied, and Defendants' objection to Magistrate Judge Gauvey's order will be overruled.


I.  Background

In 1989 or 1990, Medibill was established as a small medical

1

billing company located in Annapolis, Maryland.[1]  Compl. at ¶¶ 1, 10-11.  Ms. Smith was the President and owner of Medibill.  *Id.* at ¶¶ 2, 10.  Medibill provided specialized medical billing services to anesthesiologists practicing in Anne Arundel County, Maryland.  *Id.* at ¶ 11; Def. Mot. at 16.  Medibill's primary client was Anesthesia Company, LLC ("ANCO"), a group of medical professionals, including Dr. Smith, who specialize in the practice of anesthesiology in Anne Arundel County.  *Id.* at ¶ 12; Ex. A at 96-97.  Medibill began providing billing and collection services to ANCO in August 1995.[2]  *Id.* at ¶ 13.  Medibill continued providing services to ANCO even though its contract with ANCO had never been formally renewed.[3] Pls. Opp. at 6.

---

[1] The parties disagree over the exact formation of Medibill. Plaintiffs contend that Ms. Smith began providing billing and collection services to her son, Dr. Terence Smith ("Dr. Smith"), an anesthesiologist, in 1989.  Pls. Opp. at 4.  In 1990, Ms. Smith and Dr. Smith formed Medibill and the company began providing billing services to other practicing anesthesiologists in Anne Arundel County.  *Id.*  In 2001, Dr. Smith gave his interest in Medibill to Ms. Smith as a gift.  *Id.*; Ex. A at 40. Defendants argue that Dr. Smith alone formed Medibill.  Def. Mot. at 2. Ms. Smith testified at her deposition that Dr. Smith was the sole owner of Medibill prior to 2001.  Pl. Opp. Ex. A at 21.

[2] Dr. Smith and Dr. Michael Singleton formed ANCO in 1996. Pls. Opp. at 5; Def. Mot. at 2.  Dr. Smith served as the managing member of ANCO from its inception through the summer of 2004. Pl. Opp. at 5.  Medibill had already been providing billing services to most of the individual doctors who joined ANCO.  *Id.* Medibill became the exclusive billing and collection company for ANCO.  *Id.* at 5-6.

[3] Medibill and ANCO entered into a "Billing and Collection Agreement" on August 20, 1998 for an initial three year term

ABC is a large physician anesthesiology practice management company located in Michigan, although ABC transacts business in Maryland.  Compl. at ¶¶ 3, 16.  ABC provides practice management and consulting services to anesthesiologists nationwide.  *Id.* Locke is an agent and a vice-president of ABC.  *Id.* at ¶ 4.  In June 2003, ABC and ANCO entered into a consulting agreement in which ABC would provide practice management advice to ANCO.[4]  *Id.* at ¶ 17.

In October 2003, Dr. Lange asked Medibill to prepare several reports for ABC, which Medibill provided.  *Id.* at ¶ 18; Def. Mot. Ex. L and M.  Later in October 2003, Gonzalo Lopez ("Lopez"), an ABC representative, asked Ms. Smith for additional information, which she provided.  *Id.* at ¶ 19; Def. Mot. Ex. N.  Ms. Smith met with Locke and Lopez on November 5, 2003 when they discussed the documentation Ms. Smith had previously provided and additional information about Medibill's business operation as it related to ANCO.  *Id.* at ¶¶ 20-22.

On November 6, 2003, Locke and Lopez met with several of the

---

terminating on August 20, 2001.  *See* Agreement attached to Def. Mot. at Ex. E.  The Agreement was never renewed, but the parties continued to operate under the terms of the contract.  Ms. Smith testified at her deposition that the agreement continued, because she continued to work and ANCO continued to pay her.  Pl. Opp. Ex. A at 161.

[4] On April 9, 2003, ABC sent a proposal to Dr. David Lange of ANCO.  The agreement was signed by Locke and Dr. Lange in June 2003.  *See* Def. Mot. Ex. J.

physician members of ANCO.  *Id*. at ¶ 23.  Locke also made an oral presentation accompanied by a PowerPoint slide show, in which several references were made regarding Medibill and Ms. Smith - both complimentary and critical.  *Id*. at ¶¶ 23-25.  Following the presentation, ABC distributed a report to ANCO entitled "An Assessment of Group Business Practices" (the "ABC Report"), which contained additional references to Medibill and Ms. Smith.  *Id*. at ¶ 27.  Plaintiffs allege that the presentation and ABC Report contained numerous false and misleading statements intended to damage Medibill's relationship with ANCO.  *Id*. at ¶¶ 26, 28.

In January 2004, ABC provided ANCO with a list of qualified billing vendors that identified ABC, but excluded Medibill.  *Id*. at ¶ 38; Pls. Opp. Ex. W.  On June 30, 2004, ANCO informed Medibill that ANCO had entered into a letter of intent with ABC to provide billing invoices for ANCO "effective 90 days from today."  *Id*. at ¶ 39.  On July 9, 2004, ANCO notified ABC that it was terminating its contract with Medibill effective October 1, 2004.  *Id*. at ¶ 40.

On November 5, 2004, Plaintiffs filed their Complaint in the Circuit Court for Anne Arundel County.  Defendants removed the action to this Court on December 23, 2004.[5]  Plaintiffs have alleged the following claims against Defendants: (1) two counts

---

[5] The Summons and Complaint were served upon Locke on November 24, 2004 and upon ABC on December 20, 2004.  Notice of Removal at ¶ 2.

of defamation; (2) two counts of invasion of privacy by false
light; (3) tortious interference with contract; (4) tortious
interference with prospective business relationship and
advantage; (5) violation of the Maryland Uniform Trade Secret
Act; (6) Unfair and/or Deceptive Trade Practices; (7) fraud and
misrepresentation; (8) negligent supervision and seek
compensatory and punitive damages of $1 million dollars for each
count asserted in the Complaint.


II.  Analysis

A.  Motion to Dismiss and Cross Motions for Summary Judgment

1.   Standard of Review

    Defendants have moved to dismiss Plaintiffs' claim for
misappropriation of trade secrets (Count V of the Complaint).
Defendants also contend that all of Plaintiffs' claims fail as a
matter of law because the Plaintiffs have failed to show any
injury caused by the Defendants.[6]  Under Rule 12(b)(6), a motion
to dismiss should be granted "only if it is clear that no relief
could be granted under any set of facts that could be proved

---

[6]Plaintiffs contend that the ABC Report and presentation by
Locke defamed Medibill and Ms. Smith, which caused ABC to
interfere in Medibill's business relationship with ANCO.  Pls.
Opp. at 25-27.  Defendants contend that the ABC Report and
presentation did not cause ANCO to sever its ties with Medibill,
but instead the Request for Proposals ("RFP") process and other
qualified billing companies led ANCO to terminate its
relationship with Medibill.  Def. Mot. at 17-19.

consistent with the allegations." *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002), (*citing Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)); *Mylan Laboratories, Inc. v. Raj Matkari, et. al.*, 7 F.3d 1130, 1134 (4th Cir. 1993).   All allegations are treated as true, and the complaint is viewed in the light most favorable to the plaintiff.   *Mylan*, 7 F.3d at 1134.

In deciding a Rule 12(b)(6) motion, the Court will consider the facts stated in the complaint and any attached documents. *Biospherics, Inc., v. Forbes, Inc.*, 989 F. Supp. 748, 749 (D. Md. 1997), *aff'd*, 151 F.3d 180 (4th Cir. 1998)). The Court may also consider documents referred to in the complaint and relied upon by the plaintiff in bringing the action.   *Id.*

Defendants have moved for summary judgment on Plaintiffs' remaining claims.   Plaintiffs have filed a cross motion for partial summary judgment on the issue of liability on all counts in the Complaint.   Summary judgment is appropriate when there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.   In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986), the Supreme Court explained that, in considering a motion for summary judgment, "the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."   A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could

6

return a verdict for the nonmoving party." *Id.* at 248. Thus, "the judge must ask... whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id.* at 252.

The court must view the facts and the reasonable inferences drawn therefrom "in the light most favorable to the party opposing the motion," *Matsushita Electric Industrial Company v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), but the opponent must produce evidence upon which a reasonable fact finder could rely. *Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). A mere "scintilla" of evidence is not sufficient to preclude summary judgment. *Anderson*, 477 U.S. at 252.

2. Defamation

Defendants argue that Plaintiffs' defamation claims against Medibill (Count I) and Ms. Smith (Count IX) fail, because they cannot establish the prima facie elements of a defamation claim, and even if they could establish their claim, the ABC Report and presentation are subject to a qualified privilege. Plaintiffs contend they should be granted summary judgment because the Defendants made statements that were defamatory per se, with actual malice, thus the damages are presumed.

7

(a) Elements of a Defamation Claim

To establish defamation of non-public figures, Plaintiffs must show: (1) Defendants made a defamatory communication; (2) the statement was false; (3) Defendants were at fault in communicating the statement; and (4) Plaintiffs suffered harm. *Southern Volkswagen, Inc. v. Centrix Financial, LLC*, 357 F. Supp. 2d 837, 843 (D. Md. 2005); *Trundle v. Homeside Lending, Inc*., 162 F. Supp. 2d 396, 400 (D. Md. 2001); *Shapiro v. Massengill*, 105 Md. App. 743, 772, 661 A.2d 202, 216-217 (1995).

A defamatory communication is a statement "tending to expose the plaintiff to public scorn, hatred, contempt, or ridicule to a third person who reasonably recognized the statement as being defamatory." *Shapiro* at 772, 216.  In deciding whether a communication is defamatory – in and of itself or in light of extrinsic facts – requires looking at the statement as a whole. *Batson v. Shiflett*, 325 Md. 684, 723, 602 A.2d 1191, 1210 (1992). "[W]ords have different meanings depending on the context in which they are used and a meaning not warranted by the whole publication should not be imputed." *Id*.  If words are capable of more than one meaning or a defamatory meaning could be inferred, then the meaning to be attributed to the words is a question of fact for the jury. *Id*. at 723, 1210-1211.

The burden of proving falsity rests with the Plaintiffs. *Id*. at 726, 1213.  Minor inaccuracies do not amount to falsity,

as long as the substance of the statement is justified.  *Id.*
"[A] statement is not considered false unless it 'would have a
different effect on the mind of the reader from that which the
pleaded truth would have produced.'" *Id.* (*quoting* R. Sack, *Libel,
Slander, and Related Problems* 138 (1980)).

Fault can be based on either negligence or constitutional
malice (also referred to as actual malice).  *Shapiro v.
Massengill*, 105 Md. App. 743, 772, 661 A.2d 202, 217 (1995).
Negligence can be established by a preponderance of the evidence,
while actual malice must be shown by clear and convincing
evidence.  *Id.*


(b) Defamation Per Se

Maryland recognizes a distinction between defamation per se
and defamation per quod.

> 'In the case of words or conduct actionable per se
> their injurious character is a self-evident fact of
> common knowledge of which the court takes judicial
> notice and need not be pleaded or proved.  In the case
> of words or conduct actionable only per quod, the
> injurious effect must be established by allegations and
> proof of special damage and in such cases it is not
> only necessary to plead and show that the words or
> actions were defamatory, but it must also appear that
> such words or conduct caused actual damage.'

*Id.* at 773, 217. (*quoting Metromedia, Inc. v. Hillman*, 285 Md.
161, 163-164 400 A.2d 1117 (1979)).  The determination of whether
an alleged defamatory statement is per se or per quod is a matter
of law.  *Id.*  The issue of fault is a significant consideration,

because a statement that is defamatory per se does not require a showing of actual damages, because when a statement is made with actual malice, the damages are presumed (i.e., the harm to one's reputation arises from the communication of words actionable per se).  *Id.* at 773-774, 217.

Statements disparaging the business reputation of an individual are traditionally considered to be defamation per se. *Southern Volkswagen, Inc. v. Centrix Financial, LLC*, 357 F. Supp. 2d 837, 843 (D. Md. 2005).

> 'Words spoken of a person in his office, trade, profession, business or means of getting a livelihood, which tend to expose him to the hazard of losing his office, or which charge him with fraud, indirect dealings or incapacity and thereby tend to injure him in his trade, profession or business, are actionable without proof of special damage, even though such words if spoken or written of an ordinary person, might not be actionable per se.'

*Shapiro*, 776, 218 (*quoting Kilgour v. Evening Star Co.*, 96 Md. 16, 23-24 53 A. 716 (1902)).  On the other hand, if extrinsic evidence is necessary to determine the connotation that was understood by third parties hearing or reading the alleged defamatory communication, then actual damages are required, because the communication is defamatory per quod.  *Gooch v. Maryland Mechanical Systems, Inc*., 81 Md. App. 376, 394-395, 567 A.2d 954, 963 (1990).

(c) Events Preceding the ABC Presentation

In December 2002, e-mails were exchanged between the ANCO physicians, and ANCO's management structure and conflicts of interest between Dr. Smith and Medibill were discussed.  Def. Mot. Ex. I.  A discussion arose among the ANCO physicians whether to retain a consultant to review, among other things, ANCO's structure, compensation, billing, and collections.  Def. Mot. at 6.  Locke was identified as a qualified consultant, and he sent Dr. Lange a proposal for his consulting services in April 2003.[7] *Id.*; Ex. J.  The agreement between ABC and ANCO was dated June 5, 2003 and effective for 90 days.  Pls. Opp. at 12; Def. Mot. Ex. J.  Part of ABC's engagement by ANCO involved an objective assessment of Medibill's services to ANCO.  *Id.*  Medibill was requested to gather certain information and documents to provide to ABC, so that Locke could perform an analysis of Medibill's services to ANCO.  Pls. Opp. at 13-14; Def. Mot. Ex. L.

_____

[7] There is a dispute between the parties as to ABC's involvement as consultants for ANCO.  Defendants contend that Dr. Lange knew that ABC was also a billing company, but that ABC was hired for a very discrete purpose - evaluating ANCO's practices and structure - and ABC would not be considered as a potential billing company.  Def. Mot. at 7.  Plaintiffs argue that none of the parties acted in accordance with the purported restriction, but instead ABC used its consulting practice to enhance its billing service business.  Pls. Opp. at 7-8, 12-13.  Locke's compensation provides for incentives tied to ABC's overall financial performance of which 95% is derived from its billing business.  *Id.* at 7.  Locke had also established contact with several ANCO physicians and tried to obtain some of Medibill's business with ANCO when he was employed by Datamedic, another billing service provider.  *Id.* at 8-9.

11

Again, the parties disagree, over the timing and sufficiency of the information provided by Medibill.  The Defendants contend that Medibill gathered and sent to Dr. Lange some information, but it was insufficient for ABC to perform its review.  Def. Mot. at 8.  Lopez contacted Ms. Smith for additional information.  *Id*. Ms. Smith sent some corrected information, but advised Lopez that Medibill was unable to produce certain accounts receivable information.  *Id*.

Plaintiffs argue that ABC's proposal requested documentation in April 2003, but ANCO did not request the information from Medibill until late September.  Pls. Opp. at 13.  Dr. Lange sent Medibill both a handwritten request and typed list for billing information.  *Id*.  Plaintiffs contend that they did not delay the process, but were not notified in a timely manner about the requested information.  *Id*.  Plaintiffs contend that they gathered the requested information, all relating to 2002 billing, and forwarded it to Dr. Lange in early October 2003.  *Id*.  When Lopez contacted Ms. Smith later in October, he requested 2003 information, not because the previously produced documentation was insufficient, but because Lopez wanted to review more recent information.  *Id*. at 14.  Plaintiffs allege that Ms. Smith provided the 2003 information to Lopez and corrected one item on November 3, 2003.  *Id*.

Ms. Smith, her office manager, Barbara Cox, Locke, and Lopez met on November 5, 2003.  Def. Mot. at 8; Pls. Opp. at 16. Defendants contend that the meeting lasted the "better portion of the day" although the Plaintiffs say that the meeting lasted "about ten or fifteen minutes" before Locke and Lopez went to lunch, after which Lopez met with an accountant for 90 minutes. Def. Mot. at 8; Pls. Opp. at 16-17.  Defendants allege that there were discrepancies in basic information provided by Medibill, which required meeting with the accountants for ANCO and Medibill.  *Id.* at 8.  Medibill could not produce certain historical information regarding accounts receivables on a monthly basis.  *Id.* at 8-9.

Plaintiffs allege that they provided Locke and Lopez with additional documentation about Medibill's practices and procedures.  *Id.* at 17.  Plaintiffs also contend that Locke and Lopez never asked for or reviewed the contract between ANCO and Medibill, never visited the area of the building where Medibill's operations were located, never saw Medibill's computer system, software or software manuals, never spoke with any Medibill employees other than Ms. Smith or Ms. Cox, nor reviewed any of the reports Medibill periodically prepared for ANCO.  *Id.*


(d) The ABC Presentation

Early the next morning, on November 6, 2003, Locke and Lopez

met with the ANCO physicians to present their initial findings in
an oral presentation accompanied by a PowerPoint slide show.
Def. Mot. Ex. R.  The presentation was tape recorded and
transcribed.  Def. Mot. Ex. S.  Plaintiffs allege that the
following statements made at the presentation are defamatory per
se.

> No confidence in the information that comes from your
> system reports.  The computer system is unreliable and
> antiquated.  No mechanism to reconcile or validate the
> information on the system  Ex. S at 03725, 03727; Ex. R
> at 0180.

> Ms. Smith had no idea what was in the reports she sent
> to ABC, and when information was pointed out to her,
> she had no explanation.  *Id*. at 03726.

> In anticipation of the review, Plaintiffs engaged in a
> "clean up" to manipulate the information where bad debt
> had not been written off in six months and then debt is
> posted for the two months before ABC's visit.  *Id*. at
> 03730, 03732, 03744.

> They are very good at grinding hamburger, and that's
> about all they are capable of doing.  *Id*. at 03733.

> Joetta shared with us some of her productivity metrics
> and I was surprised how low they were.  *Id*. at 03730.

> There are inconsistencies, omissions, and errors in the
> information, and then there is obvious evidence that
> either things are being lost, things are being
> misprocessed.  We haven't necessarily gotten to the
> second step, but I think that you would agree, that if
> you are about to anesthetize the patient, and half the
> chart is missing, I don't know about you, but I would
> be kind of reluctant to proceed with the anesthetic.
> *Id*. at 03726.

> I would say that you have a half million dollars, that
> when I look at your practice, I would expect that it
> ended up as cash, not as bad debt.  *Id.* at 03740.

The Defendants point out that Locke made several complimentary remarks during the presentation, including the following statement immediately before the comment about only being able to grind hamburger: "I want to make sure you all hear one thing clearly.  The infrastructure that you currently have does a fairly good job.  It is obvious from the minute you walk into the office there isn't a malicious, devious, or deceptive bone in any of those women's bodies.  They are as honest and hard working as the day is long."  *Id*. at 03733; Ex. R at 0179.

(e) The ABC Report

Subsequent to the presentation on November 6, 2003, ABC issued a written report summarizing its findings and providing additional analysis of the information orally presented to ANCO. *See* Def. Mot. Ex. U.  The report is dated November 2003, but was issued to Dr. Smith for distribution to the other ANCO physicians on December 12, 2003.  Def. Mot. at 11.  Like the presentation, the report includes both a positive and a critical assessment of Medibill.

The executive summary states that ANCO should be pleased with the commitment of the billing staff, including their ethics and integrity.  Ex. U at 02285.  The report addresses concerns regarding the billing system and the lack of reliable management information tools.  *Id*. at 02286.  The report discusses some of

15

the obstacles in ANCO agreeing to use ABC as consultants, describing the drawn out process for being retained and limited communication during the proposal process. *Id*. at 02288.

The report documents that Locke and Lopez met with Ms. Smith and Ms. Cox, both of whom were "very courteous and accommodating" although there was concern when requested documentation of billing policies appeared non-existent. *Id*. at pg. 7. "We could tell that the employees were diligent and hard-working. We could also tell that they had limited training in their specific job functions." *Id*. at 8.

The report also highlights the tension among the ANCO physicians. "We have never met with a group where there was such universal dissatisfaction with and concern about the appropriateness of the billing solution....In addition there was great sensitivity to the issue of nepotism and the reality that it was the managing partner's mother who was responsible for the group's collections." *Id*. at 18-19.

The report, consistent with the presentation, states that the bad debt write-offs were cleaned-up two months before ABC delivered their presentation to ANCO. *Id*. at 30. "[T]he statistics for Medibill are so clouded in mystery as to raise suspicions about the motivations and accuracy of the data provided via the system reports....We clearly believe there was a conscious decision to hold off in sending the data until it

16

looked clean." *Id.*

The report ends with a section on strategic options for ANCO, which includes a recommendation for restructuring Medibill or hiring a new billing and practice management company. *Id.* at 40-43.

(f) Genuine Issues of Material Fact Defeat Summary Judgment

Plaintiffs have alleged sufficient facts to establish that the remarks made by Locke at the presentation could rise to the level of being defamatory; however, the comments are not defamatory per se. Plaintiffs have stated that several of the statements are defamatory when considered in the context of the deposition testimony[8] and Medibill's task of billing and collecting millions of dollars for ANCO. Pl. Reply at 11. Consideration of extrinsic evidence precludes a finding of defamation per se. *Gooch v. Maryland Mechanical Systems, Inc.*, 81 Md. App. 376, 394-395, 567 A.2d 954, 963 (1990). To prevail at trial, Plaintiffs will need to prove defamation on the basis of the statements communicated within the presentation and report. Damages will not be presumed, thus, Plaintiffs will need

---

[8] Plaintiffs allege that the ANCO physicians were stunned and upset by the presentation and Locke's statements. Pls. Opp. at 25, fn. 48. The comment that Ms. Smith had manipulated the data in an effort to clean up the books was disturbing to the group at the presentation. *See* Affidavit of Theresa Szurek, Ex. GG at ¶ 7; Lange Tr., Ex. P at 99; Walman Tr., Ex. O at 226, 253.

to prove at trial that Defendants made false statements, knew the statements were false, and actual injury resulted from the presentation and report.

(g) Privilege

Defendants argue that even if Plaintiffs established their defamation claims, the defamatory statements are protected by a qualified privilege.[9]  There are four basic common law privileges: "(1) the public interest privilege, to publish materials to public officials on matters within their public responsibility; (2) the privilege to publish to someone who shares a common interest, or, relatedly, to publish in defense of oneself or in the interest of others; (3) the fair comment privilege; and (4) the privilege to make a fair and accurate report of public proceedings." *Gohari v. Darvish*, 363 Md. 42, 57, 767 A.2d 321, 329 (2001).  Defendants contend that any defamatory statements made by ABC and Locke are protected under the second qualified privilege - the right to publish to ANCO, because the parties shared a common interest (i.e., ANCO hired ABC to evaluate ANCO's billing functions and practice

---

[9] Defendants have also argued that the defamatory statements are protected by an absolute privilege.  However, the Court will not consider whether the Defendants are protected by an absolute privilege, because the Defendants raised this argument for the first time in their reply motion.  *Baucom v. Potter*, 225 F. Supp. 2d 585, 590 n.3 (D. Md. 2002).

management).  Def. Mot. at 22-24.

Plaintiffs argue that the Defendants are not subject to any qualified privilege, because the consulting agreement between ABC and ANCO had expired by the time Locke and Lopez made their presentation on November 6, 2003 and published the ABC Report in December 2003.  Pls. Opp. Mot. at 38.  Defendants have replied that the expiration of the consulting agreement is irrelevant, because ANCO had agreed to pay ABC for its services in evaluating Medibill and did pay ABC for the presentation and report.  Def. Reply at 16-17.  Neither party cites any case law for their positions that the expiration of the consulting agreement affects the imposition of a qualified privilege to the defamatory statements.

It appears that an agreement existed between ANCO and ABC, which obligated ABC to provide the physicians with an assessment of Medibill's services to ANCO.[10]  As part of the consulting agreement, ABC had a duty to provide ANCO with an evaluation of Medibill.  A qualified privilege based upon a common interest includes interests in business and professional dealings.  *Gohari* at 58, 329.  Further, consultants engaged in a common enterprise need to be able to share information with their clients without

_____

[10]Although ABC sent its initial proposal to ANCO in April 2003, the retainer check did not arrive until mid-August 2003. *See* ABC Report at pg. 5, attached at Def. Mot. Ex. U.  Had ABC received the retainer and not performed its evaluation, ABC could have been subject to a breach of contract action by ANCO.

fear of a lawsuit.  *Id*.  At the same time though, a privilege may be lost if it is abused.  *Id*.

Abuse of a qualified privilege can arise when false information is presented when a competitive interest becomes a part of the evaluation.  *Id*. at 63, 332.  Whether a defamatory communication enjoys a qualified privilege is a question of law; however, whether the privilege has been abused is a question of fact.  *Id*.; *McDermott v. Hughley*, 317 Md. 12, 30, 561 A.2d 1038, 1047 (1989); *Shapiro v. Massengill*, 105 Md. App. 743, 778, 661 A.2d 202, 220 (1995).  It appears that a qualified privilege covered ABC by virtue of its consulting relationship with ANCO. At trial, if the jury finds that the Defendants' communications were defamatory, then the jury will determine whether the Defendants abused their qualified privilege in making the defamatory statements.[11]


3.   Invasion of Privacy by False Light

The Defendants argue that Plaintiffs' claims of invasion of privacy by false light against Medibill (Count II) and Ms. Smith (Count VIII) fail as a matter of law.  Plaintiffs may prove false

---

[11] A competitive interest bias, if supported by the evidence, would be the subject of a jury instruction.  *Gohari* at 64, 332. If abuse of the qualified privilege by malice is argued by the Plaintiffs, the scope of malice required to defeat the privilege would be knowledge of falsity or reckless disregard for the truth.  *McDermott* at 29, 1047 (*citing Marchesi v. Franchino*, 283 Md. 131, 139, 387 A.2d 1129 (1978)).

light invasion of privacy by showing: (1) Defendants gave

publicity to a matter that placed the Plaintiffs before the

public in a false light; (2) a reasonable person would find the

false light in which the Plaintiffs were placed highly offensive;

and (3) Defendants had knowledge of or acted with reckless

disregard as to the falsity of the publicized matter and the

false light in which the Defendants placed the Plaintiffs. *Mazer*

*v. Safeway, Inc*., 398 F. Supp. 2d 412, 431 (D. Md. 2005).

The publicity required for false light invasion of privacy

differs greatly from the publication necessary to recover for

defamation. *Southern Volkswagen, Inc. v. Centrix Financial, LLC*,

357 F. Supp. 2d 837, 845 (D. Md. 2005). Defamation requires

publication, which can consist of communication to only one

person. *Id*. False light requires publicity, which entails

public disclosure. *Id*. Plaintiffs must establish that the

Defendants disclosed private facts to the public at large.

*Mazer*, 398 F. Supp. 2d at 431. Publicity means "'that the matter

is made public, by communicating it to the public at large, or to

so many persons that the matter must be regarded as substantially

certain to become one of public knowledge...Thus it is not an

invasion of the right of privacy...to communicate a fact

concerning the plaintiffs private life to a single person or even

to a small group of persons.'" *Id*. (*quoting Restatement (Second)*

*of Torts* § 652D, cmt. a. (1977)); *see also Holt v. Camus*, 128 F.

21

Supp. 2d 812, 817 (D. Md. 1999).

Plaintiffs have failed to establish the first element of their claim, because there are no allegations or evidence that the Defendants disclosed private facts to the public at large. Plaintiffs argue that the consulting proposal called for ABC to provide a preliminary draft of their findings to a key contact at ANCO, but the initial findings were communicated to a group of ANCO physicians during the presentation on November 6, 2003. Pls. Opp. At 40-41.  This publication does not rise to the level of publicity required to establish invasion of privacy by false light.  In addition, corporations do not enjoy the same privacy rights as individuals; thus, Medibill's claim for false light invasion is without support.  *AIDS Counseling and Testing Centers v. Group W Television, Inc.*, 903 F.2d 1000, 1004 n.1 (4th Cir. 1990).  Accordingly, Plaintiffs' claims of invasion of privacy by false light must fail.[12]


4.   Tortious Interference with a Contract

Count III of the Complaint alleges that the Defendants tortiously interfered with the contract between Medibill and ANCO.  To establish a claim for tortious interference with a contract, Plaintiffs must show: (1) a contract between the

---

[12] Plaintiffs' reply motion did not contest Defendants' arguments on the false light claims.

plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) damages to the plaintiff. *Ultrasound Imaging Corp. v. The American Society of Breast Surgeons*, 358 F. Supp. 2d 475, 479 (D. Md. 2005).

Defendants argue that Plaintiffs' claim fails, because the contract between Medibill and ANCO had expired by the time ABC and Locke were contacted by ANCO in April 2003. Def. Mot. at 31-32. Plaintiffs contend that the contract was valid, because Medibill continued to provide the same services to ANCO after the initial three year term ended in August 2001, and ANCO continued to pay for those services. Pls. Opp. at 42-43. It appears that there was an agreement between Medibill and ANCO based upon the actions of the parties - performance of services by Medibill and payment for those services by ANCO - supporting the presumption that the contract continued beyond its termination date. *See In Re: CPC Health Corp. v. Goldstein*, 81 Fed. Appx. 805, 807 (4th Cir. 2003); *Lerner v. Ammerman*, 56 Md. App. 134, 141, 467 A.2d 187, 190-191 (1983).

Although Defendants argue that they were not aware of the contract between Medibill and ANCO, the Plaintiffs have provided sufficient contrary evidence. Dr. Lange informed Locke of the relationship between Medibill and ANCO when Locke was contacted

about providing consultation services.  *See* Pl. Reply Ex. 6.  In
addition, the purpose of the consulting agreement involved
assessing the historical billing and collection performance of
Medibill.  *See* Def. Mot. Ex. J.  Defendants' assertion that they
were unaware of a contract between Medibill and ANCO is disputed.

Defendants argue that they did not wrongfully interfere with
Medibill's contract with ANCO, but even if they did, ANCO had the
right to terminate the contract, which does not constitute a
breach of contract.  Def. Mot. at 32-33.  Proof of breach of
contract is not an essential element of this tort.  *Trimed, Inc.*
*v. Sherwood Medical Co.*, 977 F.2d 885, 890 (4th Cir. 1992).
Although Plaintiffs may ultimately not prevail at trial, they
have alleged sufficient facts to support an inference of
Defendants' motivation to wrongfully interfere with Medibill's
contract with ANCO.

At trial, Plaintiffs must prove that the Defendants caused
ANCO to terminate the contract with Medibill, as opposed to
Defendants theory of the case, which is that ANCO decided to hire
ABC for its billing services after the RFP process.  The Jury
will need to consider such factors as the nature of Defendants'
conduct, their motives, ANCO's interests, the interests sought to
be advanced by the Defendants, societal interests in protecting
the freedom of action by the Defendants, the contractual
interests of Medibill, the proximity or remoteness of Defendants'

24

conduct to the interference, and the relations between the

parties.[13]  *Id.* at 890 (*citing Restatement (Second) of Torts* §

767 (1977)).


5.  Tortious Interference with Prospective Business

Count IV of the Complaint alleges that the Defendants

tortiously interfered with Medibill's prospective business

relationship and advantage by obtaining confidential and

proprietary business information from Medibill, which Defendants

used to supplant Medibill's services to ANCO.  To establish their

claim, Plaintiffs must show: (1) intentional and willful acts;

(2) calculated to cause damage to Plaintiffs in their lawful

business; (3) done with the unlawful purpose to cause damage and

loss, without right or justifiable cause on the part of the

Defendants (which constitutes malice); and (4) actual damages.

*Volcjak v. Washington County Hospital Ass'n*, 124 Md. App. 481,

512, 723 A.2d 463, 479 (1999); *Hartmeyer v. The Trane Co.*, 216 F.

---

[13] Defendants will also have the opportunity to present
evidence at trial that ABC's consultation services provoked ANCO
to hold a retreat with another consulting group, Per Se
Technologies.  Def. Mot. at 13.  Various management issues were
discussed at the retreat, which resulted in the election of a
five member management board to replace the existing management
structure of one member, Dr. Smith, controlling management
decisions.  *Id.*  Defendants will also be able to present evidence
and argue that the RFP process, which grew out of the retreat,
dictated hiring a new billing company, as opposed to ABC's
presentation and report.  *Id.* at 13-15.

Supp. 2d 500, 504 (D. Md. 2002).

Acting to pursue one's own business interests at the expense of another is not tortious. *Settlement Solutions of America, Inc. v. Travelers Indemnity Co.*, 30 F. Supp. 2d 874, 877 (D. Md. 1998). Tortious interference with business relations requires conduct that is independently wrongful, apart from its effect on business relationships. *Id.* Wrongful acts include violence, intimidation, defamation, injurious falsehood or fraud, and violation of criminal law. *Id.*

A claim of tortious interference with prospective business advantage must be grounded in future contractual relations that are commercially reasonable, not present contractual relationships. *Kwang Dong Pharmaceutical Co. v. Han*, 205 F. Supp. 2d 489, 496 (D. Md. 2002). The tort is based on business that Plaintiffs expect to obtain, as opposed to business relationships Plaintiffs have already acquired. *Id.*

While Plaintiffs have argued that their existing relationship with ANCO was damaged, they have also alleged that any future relationship with ANCO was harmed as a result of Defendants' defamatory communications. Pls. Opp. at 44; Pls. Reply at 19-22. Defamation is the only wrongful act that Plaintiffs have alleged that could support Plaintiffs' claim for tortious interference with prospective business advantage and

26

relationship.  Plaintiffs have alleged sufficient facts to
withstand Defendants' motion; however, to prevail at trial,
Plaintiffs will need to prove that Defendants' communications
were defamatory, Defendants' abused their qualified privilege,
and the defamatory statements caused damage to Medibill's future
business prospects with ANCO.

6.   Maryland Uniform Trade Secret Act

     Count V of the Complaint alleges that the Defendants
violated the Maryland Uniform Trade Secret Act[14] ("MUTSA") by
misappropriating confidential and proprietary information
regarding Medibill's processes and procedures in providing
billing services to ANCO.  To prove misappropriation of a trade
secret, Plaintiffs must show: (1) they possessed a valid trade
secret; (2) Defendants acquired the trade secret; and (3)
Defendants knew or should have known that the trade secret was
acquired by improper means.  *Trandes Corp. v. Guy F. Atkinson
Co.*, 996 F.2d 655, 660 (4th Cir. 1993)(*citing* Md. Code Ann., Com.
Law, § 11-1201(c)(1)).  The essential element of a
misappropriation claim is abuse of confidence or impropriety in
the means of obtaining the trade secret.  *Id.* (*citing Space Aero
Prods. Co. v. R.E. Darling Co.*, 238 Md. 93, 208 A.2d 74, 84,

---

[14] *See* Md. Code Ann., Com. Law, § 11-1201, et seq. (2006).

27

*cert. denied*, 382 U.S. 843 (1965)).

To qualify as a trade secret under MUTSA, the information must "'(1) hold independent economic value because it is not generally known to or readily ascertainable by others who stand to benefit economically if they use or disclose it, and (2) be the subject of reasonable efforts to maintain its secrecy.'" *Diamond v. T. Rowe* Price Associates, Inc., 852 F. Supp. 372, 411 (D. Md. 1994)(*quoting Optic Graphics v. Agee*, 87 Md. App. 770, 787, 591 A.2d 578, *cert. denied*, 324 Md. 658, 598 A.2d 465 (1991)).

Under MUTSA, there are two types of trade secrets: (1) technological developments; and (2) internal operating information. *Id*. at 412. Internal operating information is also known as internal business facts particular to a business organization. *Id*. The owner of the information must derive value from the secrecy and must use reasonable efforts to safeguard the confidentiality of the information. *Motor City Bagels, L.L.C. v. The American Bagel Co.*, 50 F. Supp. 2d 460, 478 (D. Md. 1999).

Obtaining a trade secret by improper means includes "'theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'" *Telecom America, Inc. v. Oncor Communications,*

*Inc.*, 31 Fed. Appx. 809, 815 (4th Cir. 2002)(*quoting* § 11-1201(b)).  Disclosing a trade secret voluntarily and with consent does not constitute a misappropriation under MUTSA.  *See Diamond* at 412; *Glynn Interactive, Inc. v. iTelehealth, Inc.*, No. DKC 2003-0449, 2004 U.S. Dist. Lexis 3651, at *18 (D. Md. March 9, 2004).

Defendants argue that Plaintiffs' trade secret claim should be dismissed because the Plaintiffs have failed to (1) adequately plead a trade secret claim; (2) establish that any trade secrets were provided to the Defendants; (3) establish that any reasonable efforts were taken to maintain the alleged trade secrets; and (4) establish that Defendants acquired any alleged trade secrets by improper means.  Def. Mot. at 36.  The Court agrees.

Plaintiffs' Complaint did not specify what information or documents constituted trade secrets and even in their motions, Plaintiffs generally allege that the process by which Medibill collected and billed ANCO's charges, its software programs, rates, and reports constituted trade secrets.  Pls. Opp. at 46-47; Pl. Reply at 23-24.  There is no evidence that this information constitutes a trade secret (e.g., the computer software was not designed by Medibill, but purchased from a vendor, Misys, who sells software to other billing companies).

*See* Pls. Opp. Ex. A at 49-50, 97-98, 104-105.   More importantly, the Plaintiffs voluntarily provided the information to the Defendants, initially at the request of ANCO and later at the request of ABC, Locke, and Lopez.   Although Ms. Smith claims that she "never would have let the ABC representatives set foot in Medibill's offices" had she known that ABC was also a provider of billing services to anesthesiologists, naivete does not establish misappropriation.   Pls. Opp. at 47.

Plaintiffs have failed to establish the existence of any trade secrets or to show that the Defendants obtained trade secrets through improper means.   Accordingly, Plaintiffs claim of misappropriation of a trade secret must fail.

7.   Unfair and/or Deceptive Trade Practices

Count VI of the Complaint alleges that the Defendants "committed various acts of deceptive and/or unfair trade practices in violation of the Maryland Code."   Compl. at ¶ 89. As a result of the Defendants' practices, Medibill suffered damage to its business and reputation.   Without identifying a specific statutory provision of the Maryland Code, Defendants argue that the Complaint can only be based on the Maryland Consumer Protection Act[15] (the "MCPA"), and as such, Plaintiffs'

---

[15] *See* Md. Code Ann., Com. Law § 13-101 et seq. (2006).

claim fails because Defendants do not provide consumer services nor are the Plaintiffs consumers as defined by the Code.  Def. Mot. at 40-41.  Plaintiffs contend that their claims are covered by statutory provisions designed to protect competitors, as well as consumers, and seek relief under the common law for unfair competition.  Pls. Opp. at 44-45.

Plaintiffs allege that their claim for common law relief is evident from the Complaint, but only refer to a prior request to amend Count VI, which allegedly clarified that Plaintiffs were including a common law claim for unfair competition. Pl. Reply at 22-23; Ex. 15.  This Court denied Plaintiffs' motion for leave to amend the Complaint by order dated July 13, 2005.  *See* Docket No. 37.  References to Plaintiffs' proposed amendments, which the Court did not grant leave to amend, are unavailing at this stage of the case.  In addition, the Court will not entertain Plaintiffs' request in their opposition motion for leave to amend the Complaint.  Pls. Opp. at 45 fn 59.

Although Plaintiffs contend that common law unfair competition extends to all areas of unfair competition and business, Plaintiffs specifically pled a claim based upon the Maryland Code.  The MCPA's purpose is to provide protection to consumers purchasing consumer goods. *Fare Deals, Ltd. v. World Choice Travel.com, Inc.*, 180 F. Supp. 2d 678, 692 (D. Md.

2001)(*citing Boatel Indus. V. Hester*, 77 Md. App. 284, 303, 550 A.2d 389 (1988); *Penn-Plax, Inc. v. L. Schultz, Inc.*, 988 F. Supp. 906, 909-911 (D. Md. 1997)).   There is no basis for business competitors to bring an action under the MCPA.   *Id*.

Plaintiffs rely upon *Microsoft Corp. v. Grey Computer*, 910 F. Supp. 1077 (D. Md. 1995) for the proposition that Maryland courts have granted relief to competitors and consumers under the MCPA.   However, the court in *Microsoft* granted relief to a corporation because its consumers had been misled by the defendant's actions.   *Id*. at 1088.   Further, in a subsequent case filed by Microsoft, this Court stated that Microsoft could not bring a claim under the MCPA because the corporation was not a consumer.   *See Microsoft Corp. v. Maryland Micro.com, Inc.*, No. JFM-01-3797, 2003 U.S. Dist. Lexis 13735, at *11 n7 (D. Md. July 15, 2003).   Medibill is not a consumer, therefore, Plaintiffs' claim of unfair competition under the MCPA must fail.

8.   Fraud and Misrepresentation

Count VII asserts a claim of fraud and misrepresentation on the basis that the Defendants failed to disclose that ABC was a potential competitor which could provide billing services to ANCO.   Compl. at ¶ 94.   Plaintiffs allege that the Defendants obtained information for consulting purposes, which the

32

Defendants subsequently used to compete against Medibill.  *Id*.  A claim of fraudulent misrepresentation requires clear and convincing evidence that: (1) Defendants made a false representation of a material fact to Plaintiffs; (2) the falsity was either known to the Defendants or the representation was made with reckless indifference as to its truth; (3) the misrepresentation was made for the purpose of defrauding Plaintiffs; (4) Plaintiffs relied on the misrepresentation and had the right to rely on it; and (5) Plaintiffs suffered actual damage as a result of the misrepresentation.  *Kwang Dong Pharmaceutical Co. v. Han*, 205 F. Supp. 2d 489, 495 (D. Md. 2002); *VF Corp. v. Wrexham Aviation Corp.*, 350 Md. 693, 703-704, 715 A.2d 188, 193 (1998); *Ellerin v. Fairfax Savings, F.S.B.*, 337 Md. 216, 229, 652 A.2d 1117, 1123 (1995).

The first misrepresentation alleged in the Complaint is that Defendants did not disclose to Plaintiffs that ABC was a potential competitor capable of providing billing services to ANCO.  Neither of the parties addresses this allegation in its papers.  Although an omission of fact may serve as a misrepresentation, it appears that ABC notified Plaintiffs that ABC was a consultant for ANCO.

The second allegation concerns information the Defendants obtained from the Plaintiffs during the consultation for ANCO,

which Plaintiffs contend was improperly used and disseminated by
the Defendants, giving ABC an unfair competitive advantage.
Defendants argue that Plaintiffs cannot establish that the
presentation or ABC Report contained any false misrepresentations
with the intent to deceive the Plaintiffs.  Def. Mot. at 42-44.
Plaintiffs did not respond with any case law to support their
position, only the allegation that Locke knew many of his
statements about the Plaintiffs during the presentation were
false and revisions to the ABC Report were purposeful.  Pls. Opp.
at 49.

Setting aside the arguments advanced by the parties, the
factor that the Plaintiffs have not satisfied is proving
justifiable reliance on Defendants' alleged misrepresentations.
Plaintiffs knew all along that the Defendants were hired as
consultants to evaluate and assess Medibill's services for ANCO.
As for representations made by the Defendants in the presentation
and ABC Report, Plaintiffs have consistently alleged that the
statements were untrue, so there is no evidence that Plaintiffs
relied upon those statements.  *See Hartmeyer v. The Trane Co.*,
216 F. Supp. 2d 500, 503 (D. Md. 2002)(conceding knowledge of
actual circumstances negates any showing of reasonable or
justifiable reliance).  Satisfying a claim of fraudulent
misrepresentation requires the Plaintiffs to show that they

relied on statements made by the Defendants, not that ANCO relied on statements made by the Defendants.  Accordingly, Plaintiffs' claim must fail.

9.   Negligent Supervision

Count X alleges that ABC negligently supervised Locke by knowing that Locke would make defamatory statements, which ultimately caused harm to the Plaintiffs.  Compl. at ¶¶ 111-115. To establish a cause of action for negligent supervision Plaintiffs must prove: (1) their injury was caused by the tortious conduct of an employee that the employer knew or had reason to know by the exercise of diligence and reasonable care that the employee was capable of inflicting harm; (2) the employer failed to use proper care in supervising the employee; and (3) the employer's breach of its duty was the proximate cause of Plaintiffs' injuries.  *Jordan v. Western Distributing Co.*, 135 Fed. Appx. 582, 589 (4th Cir. 2005)(*citing Bryant v. Better Business Bureau of Greater Maryland, Inc*., 923 F. Supp. 720, 751 (D. Md. 1996)).  In cases alleging intentional torts of employees, the standard is whether the employer knew or had reason to know that the individual was dangerous.  *Id*.

The harm employers have a duty to prevent generally is physical harm, such as violent or illegal conduct that could

35

result in physical injury to co-workers or the public. *See*
*Cramer v. Housing Opp. Comm'n of Montgomery County*, 304 Md. 705,
707, 501 A.2d 35, 36 (1985)(employer negligent for rape of tenant
by housing employee); *Athas v. Hill*, 300 Md. 133, 139, 476 A.2d
710, 713 (1984)(employer owes its employees a duty to provide
safe work environment and to retain non-violent employees).
Plaintiffs' allegations do not rise to the level of harm required
for a negligent supervision claim, thus, the claim must fail.

B.   Defendants' Objections to Magistrate Judge Gauvey's Order

On September 9, 2005, this Court ordered the case referred
to Magistrate Judge Gauvey for resolution of discovery disputes.
*See* Docket No. 48.  On December 23, 2005, Judge Gauvey (1) denied
Defendants' emergency motion to compel production of documents
requested in notice of taking deposition duces tecum of Ann
Bryan, and for sanctions, as moot; (2) denied Defendants' motion
for leave to serve additional document requests and compel the
response to same; (3) granted in part and denied in part
Defendants' motion to compel Plaintiffs' answers to
interrogatories and response to first request for production of
documents; and (4) granted in part and denied in part Defendants'
motion to compel further response to interrogatories and request
for production of documents.  *See* Order at Docket No. 72 and

Memorandum Opinion at Docket No. 71.

Defendants have filed an objection to Judge Gauvey's order on the basis that (1) denial of Defendants' motion for leave to file additional document requests and compel responses to the same was clearly erroneous and will cause substantial prejudice to Defendants; and (2) denial of Defendants' motion to compel Plaintiffs to produce federal, state and local tax returns of Medibill for the years 1998 through 2004 was based upon the erroneous assumption that the tax returns are duplicative of information in Plaintiffs' financial statements.  Def. Mot. 1-3.

1.   Standard of Review

A district judge may modify or set aside any portion of a non-dispositive ruling where the magistrate judge's order is found to be clearly erroneous or contrary to law.  *See* Fed. R. Civ. P. 72(a); *see also* 28 U.S.C. § 636(b)(1)(A).  Under the clearly erroneous standard, the reviewing court is not charged with determining whether the finding is the best or only conclusion permissible based upon the evidence.  *International Assoc. of Machinists and Aerospace Workers v. Werner-Matsuda*, 390 F. Supp. 2d 479, 485-486 (D. Md. 2005).  The reviewing court does not substitute its conclusions for those of the magistrate judge.  *Id*. at 486.  This Court merely determines whether the magistrate

judge's findings are reasonable and supported by the evidence. *Id*. Objections to discovery rulings do not allow for relitigation of issues resolved by the magistrate judge. *Id*.; *see also Berman v. Congressional Towers Limited Partnership*, 325 F. Supp. 2d 590, 592 (D. Md. 2004); *Buchanan v. Consolidated Stores Corp.*, 206 F.R.D. 123, 124 (D. Md. 2002).

2.   Motion for Leave to File Additional Document Requests

Under the modified scheduling order, fact discovery in the case concluded on August 5, 2005. *See* Docket No. 26.  On August 25, 2005, Defendants filed a motion for leave to file additional document requests, alleging the document requests were necessary to respond to arguments raised by Plaintiffs at an informal settlement conference toward the end of fact discovery.  Opinion at 7; Def. Mot. at 2.

Judge Gauvey found that allowing Defendants' requests to be filed, one month after the end of discovery, would result in a modification of the scheduling order.  Opinion at 8.  As this Court had already denied a second motion to extend the discovery deadline, Judge Gauvey was reluctant to grant additional discovery.  *Id*.  Defendants had already violated the Local Rules by serving more than 30 requests for production of documents. *Id*. at 9.  As Defendants failed to offer any justification for

that violation, Judge Gauvey concluded no good cause existed for
permitting Defendants additional discovery at this stage of the
litigation.  *Id.* at 9-10.

Judge Gauvey concluded that Defendants' "'slept on their
rights'" and did not pursue additional discovery within a timely
manner consistent with the scheduling order.  Judge Gauvey also
found that Defendants had not demonstrated a radical change in
Plaintiffs' theory or prove that severe prejudice would result in
the absence of additional discovery.  *Id.* at 13.  This Court
agrees and finds no clear error in Judge Gauvey's denial of
Defendants' motion to file additional discovery requests.


3.   Motion to Compel Production of Tax Returns

On September 6, 2005, Defendants file a motion to compel
Plaintiffs to produce, among other items, federal, state and
local tax returns for the years 1998 through 2004.  Opinion at
15-16.  At the time of the motion, Plaintiffs had produced
federal tax returns for the years 1999 through 2003.  *Id.* at 16.
Judge Gauvey ordered Plaintiffs to produce either federal, state
or local tax returns for the years 1998 and 2004, but found no
compelling need for tax returns from all levels of government.
*Id.* at 17.  Plaintiffs have produced their federal tax returns
for 1998 and 2004.  Pls. Response at 4.  This Court finds no

clear error in Judge Gauvey's order and denies Defendants' motion on this issue as moot.

CONCLUSION

For the reasons discussed above, Defendants' motion to dismiss will be granted in part and denied in part, Plaintiffs' motion for partial summary judgment will be denied, and Defendants' objection to Magistrate Judge Gauvey's order will be overruled.


February 16, 2006                    _____/s/_____

Date                                 William D. Quarles, Jr.
                                     United States District Judge

40